270 So.2d 900 (1973)
Joseph Emile SHARON, Jr., et al.
v.
CONNECTICUT FIRE INSURANCE COMPANY et al.
No. 8864.
Court of Appeal of Louisiana, First Circuit.
June 26, 1972.
On Rehearing January 5, 1973.
*901 Robert W. Smith, Seale, Smith & Phelps, Baton Rouge, for appellants.
Robert L. Freeman, Freeman & Pendley, Plaquemine, for appellees.
Before LANDRY, BLANCHE and TUCKER, JJ.
LANDRY, Judge.
Connecticut Fire Insurance Company (Appellant), liability insurer of the City of Plaquemine, Louisiana (City), appeals from a judgment in favor of plaintiff, Joseph Emile Sharon, Jr. (Appellee), and members of Appellee's family, in compensation for personal injuries and property damage allegedly incurred and sustained by the flooding of Appellee's home with water from the City's sanitary sewerage system. The primary issue on appeal is whether the doctrine of res ipsa loquitur applies in an instance of this nature. The secondary determination to be made is whether plaintiff has borne the burden of proving negligence on the part of the City. The trial court found the City negligent, but did not specify in what respect. We reverse on the *902 finding that the doctrine of res ipsa loquitur is inapplicable, and on further finding that Appellee has failed to establish any negligence on the part of the City.
Appellee's home is built upon a concrete slab in an area of the City which utilizes open ditches for the drainage of surface water. The flow of drainage is from east to west through culverts under Louisiana Highway 1 and the parallel railroad right of way adjoining the highway on the west. After exiting through the outlet culverts under the highway and railroad, drainage water then flows into a system of canals maintained by the Police Jury of Iberville Parish. From these canals, the flow is into major bayous and other primary drainage facilities, none of which are under the control of the City.
The record establishes that the sewerage system is constructed as a gravity flow system, meaning that the underground conduits are installed on an incline so that water and waste deposited therein are propelled by gravity flow to a sump pit which is emptied by means of automatically controlled, electrically operated pumps. The system contains one lift station which is also operated by an automatically controlled electric pump. The lift station, however, is not situated on Appellee's street, and has no direct connection or effect upon the flow of sewerage from Appellee's home into the system and from thence to the sump pit.
It is undisputed that between October 3, 1964, and March 1, 1965, Appellee's home was flooded, on four or five occasions, with sewer water containing varying amounts of human waste from the City's sanitary sewer system. In each instance the flooding occurred either during or immediately following a heavy or prolonged rain when either the streets were flooded over or there was considerable water in the open drainage ditches. On each occasion water entered the residence by leakage through the bottom of the bathroom commode. On at least one occasion, sewerage water leaked from around the bottom of the commode and rose approximately one foot in Appellee's bathtub. The leakage did not, however, occur after each heavy rain, and never occurred during dry weather.
Appellee's home was constructed by his uncle, Joseph A. Pinell, since deceased, who did the plumbing work beneath the slab as well as the carpentry work involved. The tie in line from the residence to the city main was installed by Frank E. Murphy, licensed plumber.
According to Appellee, his home flooded initially on October 3, 1964, and at least five times thereafter. Three of the floodings, he described as "real bad", the others being of lesser degree. On the first occasion, Appellee noted water seeping or leaking between the base of his commode and the bathroom floor. Immediately following this incident, Appellee and his father removed the toilet and replaced the seal at the base of the commode. After the second instance, the seal was again replaced. On no occasion did the level of the water overflow the toilet bowl. On at least one occasion the water rose approximately half-way Appellee's bathtub. Appellee noted that on two occasions water commenced pouring in after the toilet was flushed, but all other times water flowed at the base of the toilet although it had not been flushed. Appellee also noted that the flooding occurred each time after a heavy rain. On some occasions the leakage occurred when the streets were completely inundated, and on others when there was no water covering the streets but merely water in the ditches. In addition, Appellee attested to having complained to municipal officials. Appellee also testified to the damage to his residence and the inconvenience and illnesses resulting to himself and his family as a result of the flooding.
Frank E. Murphy, licensed plumber, attested to having run the sewer line from Appellee's residence to the city main. He did not perform any plumbing work inside *903 the house. After one flooding instance, he checked the plumbing fixtures in Appellee's residence and found them satisfactory. He concluded the line was stopped up thus preventing the water from flowing out properly. He could not say, however, whether such stoppage was between Appellee's residence and the city mains or in the mains themselves. Murphy explained that the purpose of the seal at the base of the commode is primarily to prevent sewer gases from entering a residence, and not to retain water pressure. He also stated that if a seal were improperly installed or was in some manner defective, water would seep from the base of a toilet each time it was flushed.
Other residents of the area related similar problems. Ralph Laurent, neighbor, noted that his carport rests on a slab about four inches above street surface level. A shower located on the slab emitted sewer water approximately one foot high through the shower drain on one occasion when Appellee's home flooded. Mr. Laurent plugged the drain and ceased using the shower. He observed that the problem was eliminated, and did not occur again after the City performed some corrective drainage work in the area.
Another neighbor, Alvin P. Simoneaux, testified that in one instance when Appellee experienced trouble, the water rose an inch or two in Simoneaux's toilet bowl but did not overflow or cause any damage.
David John Carville, Mechanical Engineer, in the employ of the firm which designed the sewer system, testified in detail regarding the nature of the system and its method of operation. He observed that the system operated by gravity flow to the treatment plant, and was designed to accommodate waste from residences, schools, motels and similar establishments. In essence he testified that the system was constructed according to sound, acceptable engineering practices. It is not a storm sewer system intended to take care of storm surface drainage and ground water. He explained that a sanitary sewer system contemplates the infiltration of a certain amount of ground and sub-surface water because construction of a system so "tight" as to exclude all exterior moisture and ground water would be prohibitive in cost to the point of impracticality. For these reasons, design includes allowance for infiltration of water around manholes, pipe joints and other means of entry. Carville noted that if the system became inundated with water due to infiltration of ground water during heavy rains, water would exit the system at the lowest point whether it be a manhole, commode or any other type opening in the system. From the plans of the system, Carville noted that Appellee's home was constructed in one of the lowest elevations in the area.
Mr. Carville explained that the collection point or sump pit is drained into the treatment plant by means of two pumps of three and five horsepower, respectfully. The pumps are electrically run and automatically controlled by floats. The smaller pump operates at normal pit levels. Should the level rise, the larger pump comes on automatically and the smaller pump goes off. If the water rises above the capacity of the larger pump, the smaller pump again comes on to assist. As the pumps clear the pit, they operate in reverse order.
Although Mr. Carville could not state exactly the cause of Appellee's difficulty, he was of the definite opinion that had Appellee's commode had a proper seal, water would have risen in the toilet bowl and have overflowed the top of the bowl, if at all. In his opinion, a proper seal would have prevented leakage at the base of the commode. In explaining why Appellee had no difficulty when water was standing on his property and covered the street, but had trouble when there was only water in the drainage ditches, Mr. Carville explained that the sewer system was probably not filled by infiltered water by a hard, fast rain which left water standing on the ground, but then drained off properly. He *904 pointed out that it would take a long sustained rain for the system to become completely infiltered to such extent that water would exit at the lowest available outlet.
C. Z. Breaux, Mechanical Engineer, in general corroborated the testimony given by Carville. It was his opinion that if Appellee's trouble occurred during or after heavy rains, the most likely conclusion would be that infiltration of surface water contributed to the problem. He also noted that a detailed study would be required to determine how much of such a problem was caused by inadequate surface drainage.
Two City Councilmen, Warren Hebert and D. J. McDuffie, testified in substance that upon complaint from Appellee, they visited Appellee's residence during one instance that the flooding occurred. Both stated that Henry Vadnais, Superintendent of the City Sanitation Department, told them that on one occasion when he went to investigate a complaint by Appellee, Vadnais checked and found that the pumps were not operating.
Henry Vadnais, Superintendent, Sanitation Department of the City, denied having told either Hebert or McDuffie that the pumps failed on one occasion when Appellee had trouble. He stated it was not his responsibility to check the pumps, and he had never done so. He also stated that he checked the point where Appellee's line tied into the City's main and found a hole covered by a piece of tin held in place by a coating of cement. The hole was admitting ground water into the sewer system. This defect was corrected.
The City's Superintendent of Utilities, Pershing Thompson, testified the pumps were checked daily each morning, and as soon as practicable after each storm or period of extremely bad weather to determine if any storm damage had occurred. He explained that the pumps never both failed to operate at the same time except when electrical power was interrupted due to bad weather or a blown fuse. Thompson also stated that at no time within his memory had both pumps simultaneously failed due to mechanical breakdown. In addition, Thompson stated that on none of the occasions on which Appellee sustained flooding was there a power failure to Thompson's knowledge, and his log sheet showed no power failure in any such instance.
Richard L. Roe, Licensed Plumber, testified in effect that if a toilet is properly installed and its seal correctly set and applied, water will not leak around the base of the commode. He also stated that no pressure is generated in a properly working sewer system, and that the purpose of the seal is to prevent sewer gas from entering a residence and to prevent the leakage of water when a toilet is flushed. He conceded he did not know how much pressure would be required to break a properly installed seal. In his opinion, if a seal were intact and the system filled with water, pressure could build from a clogged line but the seal should hold and water should rise in the toilet bowl rather than leak out at the seal.
In relying chiefly upon the doctrine of res ipsa loquitur, Appellee points out that control of the sewer system rests exclusively upon the City; that the nature of the occurrences are such that it is impossible for Appellee to know or ascertain the cause thereof, and that an explanation of the cause or causes is more readily accessible to the City than to Appellee.
It is well settled that the doctrine of res ipsa loquitur is not a rule of law, but rather an evidentiary principle which is determined at the conclusion of the trial. Day v. National U.S. Radiator Corporation, 241 La. 288, 128 So.2d 660.
Mere invocation of the doctrine of res ipsa loquitur does not shift to defendant the burden of proving freedom from fault. In Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389, the Supreme Court pointed out that res ipsa loquitur does not *905 modify the rule that negligence is never presumed, and neither does it dispense plaintiff from the burden of establishing negligence. See also Morales v. Employers Liability Assurance Corporation, 202 La. 755, 12 So.2d 804.
The instances in which res ipsa loquitur are applicable were stated in Langlinais v. Geophysical Service, Inc., 237 La. 585, 111 So.2d 781, as follows:
"It is well established in the Louisiana jurisprudence that the doctrine of res ipsa loquitur must be applied to a case if the accident which damaged plaintiff was caused by an agency or instrumentality within the actual or constructive control of the defendant, if the accident is of a kind which ordinarily does not occur in the absence of negligence, and if the evidence as to the true explanation of the accident is more readily accessible to the defendant than to the plaintiff."
Res ipsa loquitur is applicable when the facts suggest that the negligence of defendant is the most plausible explanation of the accident. King v. King, 253 La. 270, 217 So.2d 395, and authorities therein cited.
However, res ipsa loquitur does not apply when the proof consists of direct evidence which adequately explains the accident and which establishes the details of the negligence charged. King v. King, above. In King, above, res ipsa loquitur was held inapplicable because the record contained the testimony of two eye witnesses explaining precisely how the accident occurred. In Day, above, the Supreme Court noted that the doctrine of res ipsa loquitur is inapplicable where there is direct evidence as to the exact cause of the accident and its attending facts and circumstances. Day, above, held res ipsa loquitur inapplicable because the exact cause of the boiler explosion was established by the evidence.
Equally well established is the rule that res ipsa loquitur does not apply where the record shows the existence of more than one reasonable explanation as to the cause of the accident. In Morales, above, plaintiff sued for injuries sustained when she fell from the side door of an ambulance, allegedly due to a defective lock. The court in Morales, above, noted the accident could have resulted from plaintiff inadvertently leaning against the door handle causing the door to open. The court also observed that the portion of the ambulance occupied by plaintiff and her accompanying relatives was not within defendant's exclusive control. With regard to res ipsa loquitur, the Court, in Morales, above, noted:
"It is the duty of the plaintiff to prove negligence affirmatively; and while the inference allowed by the rule of res ipsa loquitur constitutes such proof, it is only where the circumstances leave no room for a different presumption that the rule applies. When it is shown that the accident might have happened as the result of one of two causes, the reason for the rule fails and it cannot be invoked." (Emphasis by the Court.)
In urging application of res ipsa loquitur, Appellee relies upon Metoyer v. Sewerage & Water Board of New Orleans, La.App., 100 So.2d 792, and Urban Land Co. v. City of Shreveport, 183 La. 978, 162 So. 747.
Metoyer, above, applied res ipsa loquitur to an instance wherein plaintiff sustained damage when workmen attempted to unstop a clogged sewer line by means of a high pressure hose. The Court concluded that the undertaking was completely within defendant's control; that the resulting damage would not ordinarily occur if due care were exercised, and that defendant was in a better position than plaintiff to explain the cause of the mishap. Based upon the facts in Metoyer, the Court concluded the most plausible explanation of the accident was the negligence of defendant's *906 employees in forcing water into the clogged pipe.
Urban Land Company, above, was before the Supreme Court on an exception of no cause of action. The Court found that the allegations of plaintiff's petition to the effect that his damage resulted from defendant's failure to properly operate the pumps in the sewer system stated a cause of action. The Court in Urban Land Company observed that if plaintiff's allegations were true, res ipsa loquitur should apply, and remanded the case for trial. We find it significant, however, that the more recent pronouncements of the Supreme Court (Day, Morales and King, for example) indicate beyond question that the determination of whether or not res ipsa loquitur applies must be deferred until the end of the trial and be decided in the light of all evidence of record. We conclude, therefore, that as regards applicability of res ipsa loquitur, each case must be determined in the light of its own peculiar circumstances.
The fact that one case involving damages sustained by virtue of flooding from a sanitary sewer system is found to be a proper instance for applying res ipsa loquitur does not mean that all cases involving such damage automatically fall within that same rule. In each such instance, the determination must be made, at the end of the trial, in the light of the facts and circumstances appearing of record.
Considering the record before us, we conclude the doctrine of res ipsa loquitur is inapplicable in this instance. Primarily so because the record establishes several reasonable explanations for the flooding of Appellee's residence and fails to establish which of said reasonable explanations, if any, was in fact the cause of plaintiff's damage. Moreover, the record does not establish the exact cause of the damage, and neither does it show that the instrumentality which caused the damage was under the exclusive control of the City. In this latter regard, we note that the City had no control over the lines on Appellee's property; neither did it control installation of Appellee's toilet.
The present record reflects that the cause of damage in this instance may have been any one, or a combination, of the following causes: (1) Failure of Appellee to maintain a proper seal at the base of his toilet; (2) an improper tie in of Appellee's line to the City's main; (3) the clogging of the line on Appellee's property; (4) failure of the pumps to operate either due to mechanical failure or power failure; (5) flooding of the sewer system with infiltered subsurface water through joints in the City's mains or lines of individual property owners, and (6) flooding of the mains due to infiltered surface water entering through manholes covered by water because of intercepted drainage.
From the evidence before us, we cannot conclude that the damage was such that it could only occur because of negligence. Neither does the evidence lead to the conclusion that there is no room for any presumption except that the City was negligent in some manner.
We likewise find that Appellee has failed to carry the burden of establishing the City's alleged negligence in failing to properly operate and maintain the pumps, thus causing the sewer system to become filled with infiltered water. The testimony of the City's employees, Thompson and Vadnais, clearly refutes the charge of negligence in this respect. The unequivocal testimony of these witnesses is that the pumps are checked daily and as soon as practical after any storm or inclement weather which is calculated to produce a power failure. Neither of said witnesses had knowledge of either a power or mechanical failure affecting the pumps on any occasion in question. Assuming arguendo, a pump failure had been established in this instance, the City would not be liable for a resulting flooding of the system unless such failure was shown to have resulted either from the City's failure to properly maintain its equipment or failure *907 to repair a breakdown with due dispatch under the circumstances. Neither of such circumstances is disclosed by the record.
The judgment of the trial court is reversed and judgment rendered herein in favor of defendant-appellant, Connecticut Fire Insurance Company, and against plaintiff-appellee, Joseph Emile Sharon, Jr., dismissing plaintiff's suit, with prejudice; all costs of these proceedings to be paid by plaintiff, Joseph Emile Sharon, Jr.
Reversed and rendered.
BLANCHE, Judge (dissenting):
In this case the majority has decided to reverse the judgment of the trial court in favor of plaintiffs, concluding that plaintiffs have failed to establish negligence on the part of the City of Plaquemine, defendant's insured, with regard to the design, construction and operation of its sewerage system. The majority opinion also infers that liability cannot be predicated in a case such as this except on the basis of negligence. This writer respectfully dissents.
The trial judge, in Written Reasons for Judgment, concluded the following:
"It is the opinion of this Court that the sewerage system of the City of Plaquemine was faulty and that due to this faulty condition, the plaintiffs suffered damages." (Written Reasons for Judgment, Record, p. 35)
In the opinion of this writer the trial court could have been justified in rendering judgment in favor of plaintiffs on the basis of the testimony of two City Councilmen, Warren Hebert and D. J. McDuffie, who both testified that they were advised by Henry Vadnais, Superintendent of the City Sanitation Department, that the reason for plaintiffs' residence being subjected to sewage inundation was the failure of the City's pumps to be operating. Vadnais denied ever making such an inculpatory statement to either of the City Councilmen, but the trial judge could easily have resolved this credibility issue in plaintiffs' favor.
The overwhelming preponderance of the evidence establishes that the plaintiffs were subjected to several separate instances of sewage overflow in their residence, which unpleasant experiences were shared to lesser extents by several of the plaintiffs' neighbors on different occasions. This evidence negates the supposition contained in the majority opinion that the damage sustained by plaintiffs could have been the result of an improper the-in of their line to the City's main or to the clogging of the line on plaintiffs' property, inasmuch as neighbors who experienced similar difficulties were on different tie-ins, and it borders on the ridiculous to conclude that all of these neighbors coincidentally had improper tie-ins to the City's street sewerage line, especially since these adverse effects were not regularly encountered. Similarly, the supposition that plaintiffs sustained damage due to a defective seal at the base of their toilet fails to recognize that all of the experts who testified unequivocally indicated that the sole function of this seal is to prevent sewer gas from entering the living area, and does not constitute a pressure seal capable of withstanding water pressure created by backing sewage.
Even assuming the correctness of the majority's determination that the trial court committed manifest error in finding the sewerage system of the City of Plaquemine to have been "faulty" and equating this determination with "negligence," it seems clear to this writer that liability can properly be imposed upon defendant as the insurer of the City of Plaquemine, which exclusively operated and maintained the sewerage system, on bases other than negligence.
The evidence shows that plaintiffs experienced no difficulty with sewage as long as they were able to utilize their septic tank for the disposal thereof. It was not *908 until after plaintiffs were compelled to tie in with the City's sewerage system that they encountered difficulties. The City is given the right under its police power to compel the owners of premises located within three hundred feet of the sewerage system to connect thereto, R.S. 33:4004 and R.S. 33:4041. It does not follow from these statutes, however, and indeed is unconscionable, that an owner of such premises can seek redress only if he can establish negligence, notwithstanding his having been compelled to connect to a defective municipal-operated sewerage system. On the contrary, liability has been imposed upon municipal corporations without regard to the question of negligence, but on the basis of violation of servitudes imposed by operation of law.
One such servitude is that provided by Louisiana Civil Code Article 667, which reads as follows:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
This codal provision was held to apply to a municipality in Hamilton v. City of Shreveport, 180 So.2d 30 (La.App.2nd Cir. 1965), writ refused, 248 La. 700, 181 So.2d 399.
Similarly, Louisiana Civil Code Article 660 has been held applicable to municipalities, thus warranting imposition of liability thereon. This codal provision reads as follows:
"It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.
"The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water.
"The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome."
In Chandler v. City of Shreveport, 169 La. 52, 124 So. 143 (1929), the Louisiana Supreme Court applied Louisiana Civil Code Article 660 against a municipality, holding that a municipality cannot, without rendering itself liable for resulting damages, construct drains or sewers or otherwise improve streets so as to collect surface water in artificial channels and discharge it in increased quantities or in new and destructive currents upon private property.
A more recent example of the applicability of this principle by the Louisiana Supreme Court is found in Eschete v. City of New Orleans, 258 La. 134, 245 So.2d 383 (1971), wherein that Court reversed the intermediate appellate court and held that plaintiff stated a cause of action against the City for "fault in adding new subdivisions, thus increasing the volume of water in the drainage area," that is, making extant living conditions more onerous on city residents through government action.
As early as 1910 it was clearly established by the Louisiana Supreme Court that a municipality cannot through a legitimate exercise of its police power damage with impunity the property of city inhabitants. Landry v. City of Lake Charles, 125 La. 210, 51 So. 120 (1910).
In the instant case the evidence overwhelmingly establishes that the damage experienced by plaintiffs to their residence on frequent occasions resulting from the improper discharge of sewage water and human waste material into their home is properly attributable either to a malfunctioning of the sewer pumps resulting in the building up of sewage and concomitant sewerage back pressure or to an inadequately designed system or an improperly constructed system which permitted too much storm drainage water to infiltrate the sanitary sewer system with the same adverse results. Even if there be no proof *909 of negligence on the part of the City's employees, the evidence, nevertheless, clearly warrants imposition of liability on the basis of violation by the City of either Louisiana Civil Code Articles 660 or 667.
Moreover, once the City has compelled plaintiffs to connect to its sewerage system, it incurs the obligation to dispose of sewage properly, which obligation the City obviously breached on several occasions resulting in the damages sustained by plaintiffs. The fact that this breach might have occurred without negligence does not make it inactionable.
The trial judge properly concluded that the sewerage system of defendant's insured was faulty and that due to this faulty condition the plaintiffs suffered damages. No manifest error was committed by the trial judge herein, and the judgment should, accordingly, be affirmed.
I respectfully dissent.

ON APPLICATION FOR REHEARING
PER CURIAM
A majority of the panel of this Court which originally considered this appeal voted to reverse the judgment of the trial court in favor of plaintiffs. On rehearing, a majority of this Court concludes that the judgment of the trial court in favor of plaintiffs is correct and is affirmed.
The general factual situation giving rise to this litigation has been adequately set forth in the original opinion. On further consideration, we believe that the evidence adequately establishes negligence on the part of the City of Plaquemine, defendant's insured, with regard to the design, construction and operation of its sewerage system. The trial judge, in Written Reasons for Judgment, concluded the following:
"It is the opinion of this Court that the sewerage system of the City of Plaquemine was faulty and that due to this faulty condition, the plaintiffs suffered damages." (Written Reasons for Judgment, Record, p. 35)
The overwhelming preponderance of the evidence establishes that the plaintiffs' residence was subjected to several separate instances of sewage overflow, which unpleasant experiences were shared to lesser extents by several of the plaintiffs' neighbors on different occasions. This evidence negates the supposition that the damage sustained by plaintiffs could have been the result of an improper tie-in of their line to the City's main or to the clogging of the line on plaintiffs' property, inasmuch as neighbors who experienced similar difficulties were on different tie-ins, and it borders on the ridiculous to conclude that all of these neighbors coincidentally had improper tie-ins to the City's street sewerage line, especially inasmuch as these adverse effects were not regularly encountered. Similarly, the supposition that plaintiffs sustained damages due to a defective seal at the base of their toilet fails to recognize that all of the experts who testified unequivocally stated that the sole function of this seal was to prevent sewer gas from entering the living area and was not designed to act as a pressure seal capable of withstanding water pressure created by backing sewage. Mr. Charles Z. Breaux, Jr., an engineer, gave expert opinion testimony that if the damage sustained by plaintiffs occurred only after heavy rains, then the damage would be attributable either to a malfunction of the City's pumps or to an excessive infiltration of drainage water into the sanitary sewer system.
Two Councilmen for the City of Plaquemine, D. J. McDuffie and Warren J. Hebert, testified that they were advised by Henry G. Vadnais, Superintendent of the City Sanitation Department, that the reason for the sewage damage to plaintiffs' residence was the failure of the City's pumps to be operating. Mr. Vadnais denied ever making such a statement to either of the City Councilmen, but the trial judge *910 obviously resolved this credibility issue in plaintiffs' favor. Considering the frequency of proven episodes of sewage inundation sustained by plaintiffs, as well as by their neighbors, we conclude that the most probable explanation therefor is negligence on the part of employees or agents of defendant's insured in the manner of operating and supervising the sewerage system, or the faulty and defective design thereof. Plaintiffs are, accordingly, entitled to recover from defendant since they have proved that more probably than not their damages were caused by the negligence of defendant's insured, see Boudreaux v. American Insurance Company, La.App., 264 So.2d 621, 636 (1972).
Alternatively, we are satisfied that liability can and should properly be imposed upon defendant as the insurer of the City of Plaquemine, which exclusively operates and maintains the sewerage system, for the following reasons.
The evidence shows that plaintiffs experienced no difficulty with sewage as long as they were able to utilize their septic tank for the disposal thereof. It was not until after plaintiffs were compelled to tie in with the City's sewerage system that they encountered difficulties. The City is given the right under its police power to compel the owners of premises located within three hundred feet of the sewerage system to connect thereto, R.S. 33:4004 and R.S. 33:4041. It does not follow from these statutes, however, and indeed is unconscionable, that an owner of such premises can seek redress only if he can establish negligence, notwithstanding his having been compelled to connect to a defective municipal-operated sewerage system. On the contrary, liability has been imposed upon municipal corporations without regard to the question of negligence, but on the basis of violation of servitudes imposed by operation of law.
One such servitude is that provided by Louisiana Civil Code Article 667, which reads as follows:
"Although a proprietor may do with his estate whatever he pleases, still he can not make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him."
This codal provision was held to apply to a municipality in Hamilton v. City of Shreveport, 180 So.2d 30 (La.App.2nd Cir. 1965), writ refused, 248 La. 700, 181 So.2d 399.
Similarly, Louisiana Civil Code Article 660 has been held applicable to municipalities, thus warranting imposition of liability thereon. This codal provision reads as follows:
"It is a servitude due by the estate situated below to receive the waters which run naturally from the estate situated above, provided the industry of man has not been used to create that servitude.
"The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water.
"The proprietor above can do nothing whereby the natural servitude due by the estate below may be rendered more burdensome."
In Chandler v. City of Shreveport, 169 La. 52, 124 So. 143 (1929), the Louisiana Supreme Court applied Louisiana Civil Code Article 660 against a municipality, holding that a municipality cannot, without rendering itself liable for resulting damages, construct drains or sewers or otherwise improve streets so as to collect surface water in artificial channels and discharge it in increased quantities or in new and destructive currents upon private property.
A more recent example of the applicability of this principle by the Louisiana Supreme Court is found in Eschete v. City of New Orleans, 258 La. 134, 245 So.2d 383 (1971), wherein that Court reversed the intermediate appellate court and held that *911 plaintiff stated a cause of action against the City for "fault in adding new subdivisions, thus increasing the volume of water in the drainage area," that is, making extant living conditions more onerous on city residents through government action.
As early as 1910 it was clearly established by the Louisiana Supreme Court that a municipality cannot through a legitimate exercise of its police power damage with impunity the property of city inhabitants, Landry v. City of Lake Charles, 125 La. 210, 51 So. 120 (1910).
In the instant case the evidence overwhelmingly establishes that the damage experienced by plaintiffs to their residence on frequent occasions resulting from the improper discharge of sewage water and human waste material into their home is properly attributable either to a malfunctioning of the sewer pumps resulting in the building up of sewage and concomitant sewerage back pressure or to an inadequately designed system or an improperly constructed system which permitted too much storm drainage water to infiltrate the sanitary sewer system with the same adverse results. Even if there be no proof of negligence on the part of the City's employees, the evidence, nevertheless, clearly warrants imposition of liability on the basis of violation by the City of either Louisiana Civil Code Articles 660 or 667.
Moreover, once the City has compelled plaintiffs to connect to its sewerage system, it incurs the obligation to dispose of sewage properly, which obligation the City obviously breached on several occasions resulting in the damages sustained by plaintiffs. The fact that this breach might have occurred without negligence does not make it inactionable.
The Louisiana Constitution provides that no person shall be deprived, inter alia, of property except by due process of law, and private property can neither be taken nor damaged except for public purposes and then only after just and adequate compensation is paid therefor, Louisiana Constitution of 1921, Article 1, Section 2. Similarly, the Louisiana Constitution provides that vested rights cannot be divested unless for purposes of public utility and then only for just and adequate compensation previously paid therefor, Louisiana Constitution of 1921, Article 4, Section 15. These, as well as similar provisions of the United States Constitution, afford still another basis for affirming the judgment of the trial court, since a contrary result flowing from the facts of the instant case would amount to a deprivation of these constitutional guarantees. Again, and assuming arguendo the absence of proof of negligence, such does not gainsay imposition of liability upon a defendant under the facts herein presented.
The trial judge properly concluded that the sewerage system of defendant's insured was faulty and that due to this faulty condition the plaintiffs suffered the damages awarded to them. No manifest error was committed by the trial judge herein, and the judgment appealed from, accordingly, is affirmed, with all costs of this appeal assessed to defendant.
Affirmed.
LANDRY, Judge (dissenting).
In reversing the opinion originally rendered herein, the majority have apparently rejected plaintiff's contention that the doctrine of res ipsa loquitur is applicable herein. In this much of the majority opinion, I concur.
I disagree, however, in the majority finding that defendant City has been shown to have been negligent either in failing to properly maintain and operate its pumps or in constructing a sewer system of faulty design.
It is elementary that absent application of the doctrine of res ipsa loquitur, plaintiff bears the burden of establishing alleged negligence on defendant's part.
I think the factual analysis of the testimony concerning the issue of alleged pump failure contained in the original opinion and adopted by the majority clearly refutes *912 the argument that the system flooded because pumps were negligently allowed to remain inoperable during periods of heavy rainfall. Such evidence was provided by two witnesses, both based on hearsay. Councilmen McDuffey and Hebert testified they were both so informed by defendant's Superintendent of Sanitation, Henry G. Vadnais. The record contains Vadnais' categorical denial of having made such an admission. Moreover, Vadnais testified his logs did not disclose any power or pump failures on any of the dates on which plaintiff's home was flooded. Presumably these logs were available and could have been introduced by plaintiff if they contradicted Vadnais' testimony in any respect. I find nothing in the record to support the finding of the trial court, and the majority of this court, that pump failure was the cause of the flooding. Still less do I find any evidence of negligent conduct on the part of the City's employees in this regard.
With respect to alleged faulty design, the sole expert testimony concerning design of the system was given by David John Carville, Mechanical Engineer. Mr. Carville reviewed the specifications for the system and unequivocally testified the design was in accord with accepted engineering practices and principles. In finding the design was defective, the majority have relied simply upon the testimony of Charles Z. Breaux, Jr., Engineer, who did not examine the specifications, but merely gave an opinion based upon a narration of facts to the effect the system flooded only following heavy rains.
Alternatively, the majority have imposed liability pursuant to LSA-C.C. art. 667, which holds an owner responsible for a use of his land which causes injury to another. The majority contention that liability has been imposed upon municipalities, pursuant to Article 667, above, irrespective of negligence, is not supported by the authorities cited. In Hamilton v. City of Shreveport, La.App., 180 So.2d 30, defendant was held liable for damages to plaintiff's property resulting from flooding and erosion caused by the waters of Cross Lake. The City was not held liable merely because of its construction of a public facility. Liability was predicated upon a finding of negligence, namely, manipulation and operation of the flood gates impounding the lake's waters in such a manner as to cause the flooding and erosion.
I likewise find the majority's reliance upon LSA-C.C. art. 660 is misplaced. Chandler v. City of Shreveport, 169 La. 52, 124 So. 143, cited by the majority, was a suit for an injunction to compel removal of culverts installed as part of a street improvement project. The presence of the culverts diverted natural drainage, subjecting plaintiff's premises to the flow of waters which had not previously flowed over plaintiff's lands. In holding for plaintiff, the court noted that Article 660 does not authorize a municipality to dispose of drainage in a manner calculated to cause damage to a landowner. The court based the City's liability on the general rule (stated in 43 C.J., p. 1145 Verbo, Municipal Corporations, § 1905) which states that municipalities are liable if their construction of drains discharge waters in increased quantities or in new and destructive currents upon private property. Again, the finding is implicit that it is not the construction of drains that make a municipality liable, rather it is construction in a manner that causes damage that gives rise to liability.
In Eschete v. City of New Orleans, La. App., 245 So.2d 383, a homeowner sued for damages to his premises occasioned by flooding. Plaintiff alleged that defendant municipality knew that a dangerous drainage condition had existed in the area for years. Plaintiff also alleged that despite said knowledge, defendant deliberately and maliciously authorized construction of new subdivisions which aggravated the existing situation and caused the flooding. In reversing a lower court ruling that plaintiff's petition did not state a cause of action, the court observed: "For its fault, the City may be held liable. * * * Hamilton v. City of Shreveport, La.App., 180 So.2d 30."
Landry v. City of Lake Charles, 125 La. 210, 51 So. 120, was an action for damages *913 allegedly caused by a street improvement project. The construction caused sidewalks to flood, and also diverted water into gullies in front of plaintiff's premises. Liability of the municipality was admitted insofar as concerned actual damages and the cost of restoring former access. The only issue was whether the municipality was liable for the cost of providing greater access than existed prior to the construction, and also the cost of beautifying plaintiff's premises following construction.
I am aware of no instance in which mere construction of a sewer system, absent a showing of negligent design, construction, maintenance or operation, has given rise to municipal liability. The majority opinion creates such a rule with which I must disagree.
I respectfully dissent.